## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| EAST TEXAS MEDICAL CENTER–ATHENS, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 17-543 (RBW) |
| ALEX M. AZAR II, in his official capacity as Secretary of the United States Department of Health and Human Services, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

The plaintiff, East Texas Medical Center–Athens ("East Texas"), seeks judicial review under the Medicare Act, 42 U.S.C. § 1395oo(f) (2012), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06 (2012), of the decision by the defendant, Alex M. Azar II, in his official capacity as Secretary of the United States Department of Health and Human Services (the "Secretary"), to assign East Texas to the Tyler, Texas Core Based Statistical Area ("CBSA") rather than to the Dallas-Plano-Irving, Texas CBSA for purposes of adjusting East Texas's wage index under the Medicare Act for the 2015 fiscal year.  See Complaint for Judicial Review of Final Adverse Agency Action and Declaratory Relief ("Compl.") ¶¶ 1–2, 6–7, 13, 27–28, 71–74. Currently pending before the Court are the Plaintiff's Motion for Summary Judgment ("Pl.'s Mot.") and the Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Mot.").  Upon careful consideration of the parties' submissions,[1] the Court concludes that it must grant in part and deny without prejudice in part

---

[1] In addition to the filings already identified and the Joint Appendix ("JA"), the Court considered the following

(continued . . .)

East Texas's motion, deny the Secretary's motion without prejudice, and remand this case to the Secretary for further proceedings consistent with this opinion.

## I.    BACKGROUND

### A.    Statutory Background

Title XVIII of the Social Security Act established the Medicare program, which provides federally funded healthcare for the elderly and people with disabilities.  See 42 U.S.C. §§ 1395c, 1395j, 1395k; see also Kaiser Found. Hosps. v. Sebelius, 708 F.3d 226, 227 (D.C. Cir. 2013). Medicare Part A provides health insurance coverage to eligible beneficiaries for inpatient hospital care, home health care, and hospice services.  See 42 U.S.C. § 1395c.  "The Centers for Medicare and Medicaid Services (CMS), a division of the Department of Health and Human Services (HHS), administers Medicare reimbursements to eligible hospitals that provide inpatient rehabilitation services."  Mercy Hosp., Inc. v. Azar, 891 F.3d 1062, 1064 (D.C. Cir. 2018); see also 42 U.S.C. §§ 1395h, 1395u.  CMS administers Medicare Part A "through contracts with [M]edicare administrative contractors" ("MACs").  42 U.S.C. § 1395h(a).

### 1.    The Prospective Payment System

CMS reimburses most hospitals participating in Medicare for inpatient services on a prospective payment system.  See id. § 1395ww(d).  The prospective "payment rates are tied to the national average cost of treating a patient in a particular 'diagnosis-related group,'" Se. Ala.

---

( . . . continued)
submissions in rendering its decision: (1) the Memorandum of Law in Support of Motion for Summary Judgment of Plaintiff East Texas Medical Center–Athens ("Pl.'s Mem."); (2) the Defendant's Memorandum of Points and Authorities in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Mem."); (3) Plaintiff East Texas Medical Center–Athens'[s] Reply in Support of Motion for Summary Judgment and Opposition to Defendant's Cross-Motion for Summary Judgment ("Pl.'s Reply"); (4) the Defendant's Reply in Support of His Cross-Motion for Summary Judgment ("Def.'s Reply"); (5) Plaintiff East Texas Medical Center—Athens's Response to Court's Request for Further Briefing ("Pl.'s Resp."); and (6) the Defendant's Reply to Plaintiff's Response to Court's August 1, 2018 Order ("Def.'s Resp.").

Med. Ctr. v. Sebelius, 572 F.3d 912, 914 (D.C. Cir. 2009) (quoting 42 U.S.C. § 1395ww(d)),

which are then adjusted for, among other factors, "different area wage levels," see 42 U.S.C.

§ 1395ww(d)(3)(E).  Specifically, the statute requires the Secretary to adjust the wage-related

portion of the standardized prospective rate (the "wage index") "for area differences in hospital

wage levels by a factor (established by the Secretary) reflecting the relative hospital wage level

in the geographic area of the hospital compared to the national average hospital wage level."  Id.

§ 1395ww(d)(3)(E)(i); see also Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 206 (1988)

(describing the wage index as "a factor used to reflect the salary levels for hospital employees in

different parts of the country").  "The wage index is updated annually," 42 C.F.R. § 412.64(h)(1)

(2017), "'on the basis of a survey' of the wage-related costs for hospitals in the United States,"

Anna Jacques Hosp. v. Burwell, 797 F.3d 1155, 1158 (D.C. Cir. 2015) (quoting 42 U.S.C.

§ 1395ww(d)(3)(E)(i).  Each year, "[t]he Secretary publishes the proposed wage indices and

solicits comments from the public[,] . . . [and] then promulgates the final wage indices as part of

the Inpatient Prospective Payment System rules and policies for that year."  Id. at 1159.

### 2.    Urban and Rural Wage Indices

CMS sets different wage indices for urban and rural areas.  See 42 C.F.R.

§ 412.64(b)(1)(ii).  CMS has defined "urban area" by adopting the definition of "metropolitan

statistical area" ("MSA") promulgated by the Executive Office of Management and Budget (the

"OMB"), see id. § 412.64(b)(1)(ii)(A),[2] and has defined "rural area" as "any area outside an

urban area," id. § 412.64(b)(1)(ii)(C).  The OMB, in turn, has defined a MSA as a

[CBSA] associated with at least one urbanized area that has a population of at least
50,000.  The [MSA] comprises the central county or counties containing the core,

---

[2] Specifically, the CMS regulation defines an urban area either as an MSA "or a Metropolitan division (in the case where a[n] [MSA] is divided into Metropolitan Divisions), as defined by [OMB]."  42 C.F.R. § 412.64(b)(1)(ii)(A).  Because metropolitan divisions are distinct areas within larger MSAs, see id., for simplicity's sake, the Court refers only to the MSA definition of an urban area for purposes of this memorandum opinion.

plus adjacent outlying counties having a high degree of social and economic integration with the central county or counties as measured through commuting.

2010 Standards for Delineating Metropolitan and Micropolitan Statistical Areas, 75 Fed. Reg. 37,246, 37,252 (June 28, 2010); see also id. at 37,246 ("The general concept of a metropolitan statistical area is that of an area containing a large population nucleus and adjacent communities that have a high degree of integration with that nucleus."). "Metropolitan and Micropolitan Statistical Areas are the two categories of [CBSAs]." Id. at 37,251; see also Anna Jacques Hosp., 797 F.3d at 1160 ("After years of study, the Secretary determined that, beginning in fiscal year 2005, she would use th[e OMB's] Core-Based Statistical Areas to calculate the wage indices.").[3]

> The OMB defines a CBSA as:
>
> A statistical geographic entity consisting of the county or counties associated with at least one core (urbanized area or urban cluster) of at least 10,000 population, plus adjacent counties having a high degree of social and economic integration with the core as measured through commuting ties with the counties containing the core.

2010 Standards for Delineating Metropolitan and Micropolitan Statistical Areas, 75 Fed. Reg. at 37,251. Put differently, CBSAs are comprised of both central counties and adjacent counties. See id. at 37,251–52. The OMB defines the term "central county" as "[t]he county or counties of a [CBSA] containing a substantial portion of an urbanized area or urban cluster or both, and to and from which commuting is measured to determine qualification of outlying counties," id. at 37,251, and defines the term "outlying county" as "[a] county that qualifies for inclusion in a

---

[3] Because micropolitan statistical areas, which are CBSAs "associated with at least one urban cluster that has a population of at least 10,000, but less than 50,000," 2010 Standards for Delineating Metropolitan and Micropolitan Statistical Areas, 75 Fed. Reg. at 37,252, are not at issue in this case, the Court, like the parties, uses the terms CBSA and MSA interchangeably, see id. at 37,251 ("Metropolitan and Micropolitan Statistical Areas are the two categories of [CBSAs].").

[CBSA] on the basis of commuting ties with the [CBSA's] central county or counties," id. at

37,252. Specifically,

> [t]he central county or counties of a CBSA are those counties that:
>
> (a) Have at least 50 percent of their population in urban areas of at least 10,000 population; or
>
> (b) Have within their boundaries a population of at least 5,000 located in a single urban area of at least 10,000 population.

Id. at 37,250. And

> [a] county qualifies as an outlying county of a CBSA if it meets the following commuting requirements:
>
> (a) At least 25 percent of the workers living in the county work in the central county or counties of the CBSA; or
>
> (b) At least 25 percent of the employment in the county is accounted for by workers who reside in the central county or counties of the CBSA.

Id. This Circuit has held that "HHS's longstanding policy of using [MSAs] . . . to define [ ]

'geographic areas' is [ ] reasonable." Se. Ala. Med. Ctr., 572 F.3d at 923.

### 3. The Lugar Statute

A provision of the Medicare Act known as the "Lugar Statute" instructs the Secretary to

assign certain rural hospitals to neighboring MSAs for the purpose of calculating their wage

indices. See JA 8. Specifically, the Lugar Statute provides:

> For purposes of [calculating prospective rates for inpatient hospital service payments], the Secretary shall treat a hospital located in a rural county adjacent to one or more urban areas as being located in the urban [MSA] to which the greatest number of workers in the county commute, if the rural county would otherwise be considered part of an urban area, under the standards for designating [MSAs] . . . described in clause (ii), if the commuting rates used in determining outlying counties . . . were determined on the basis of the aggregate number of resident workers who commute to (and, if applicable under the standards, from) the central county or counties of all contiguous [MSAs] . . . .

42 U.S.C. § 1395ww(d)(8)(B)(i).

The Lugar Statute was first adopted as part of the Omnibus Budget Reconciliation Act of 1987, see Pub. L. No. 100-203, § 4005, 101 Stat. 1330, 1330–47 to –48 (1987). "Congress intended that [the Lugar Statute] apply to a limited number of hospitals that, arguably, merited payment at the . . . urban rate because of their location in counties adjacent to at least one MSA and their commuting patterns." Interim Final Rule regarding the Medicare Geographical Classification Review Board Procedures and Criteria, 55 Fed. Reg. 36,754, 36,755 (Sept. 6, 1990). Regarding the "standards for designating [MSAs]," 42 U.S.C. § 1395ww(d)(8)(B)(i), the Lugar Statute provides that the Secretary must employ "the standards published in the Federal Register by the Director of [OMB] based on the most recent available decennial population data," id. § 1395ww(d)(8)(B)(ii).

The CMS regulation implementing the Lugar Statute largely parrots the statute itself, providing:

> For discharges occurring on or after October 1, 2004, a hospital that is located in a rural county adjacent to one or more urban areas is deemed to be located in an urban area and receives the Federal payment amount for the urban area to which the greater number of workers in the county commute if the rural county would otherwise be considered part of an urban area, under the standards for designating MSAs if the commuting rates used in determining outlying counties were determined on the basis of the aggregate number of resident workers who commute to (and, if applicable under the standards, from) the central county or central counties of all adjacent MSAs. Qualifying counties are determined based upon OMB standards, using the most recent OMB standards for delineating statistical areas adopted by CMS.

42 C.F.R. § 412.64(b)(3)(i).

### 4.     The Provider Reimbursement Review Board

A hospital that receives prospective payments for inpatient services and "is dissatisfied with a final determination of the Secretary as to the amount of th[at] payment" may seek a review of that determination by the Provider Reimbursement Review Board (the "Board" or

"PRRB"), 42 U.S.C. § 1395oo(a)(1)(A)(ii), see also Dignity Health v. Price, 243 F. Supp. 3d 43, 50 (D.D.C. 2017) (describing the Board as "an independent administrative tribunal within CMS responsible for adjudicating disputes related to Medicare reimbursement issues"), provided that "the amount in controversy is $10,000 or more, and" the hospital "files a request for a hearing within . . . 180 days after notice of the Secretary's final determination," 42 U.S.C. § 1395oo(a)(2)–(3); see also 42 C.F.R. § 405.1840 (outlining the rules regarding the Board's jurisdiction).  "A decision of the Board shall be final unless the Secretary, on his own motion, and within [sixty] days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision."  42 U.S.C. § 1395oo(f)(1).  "Judicial review of claims arising under the Medicare Act is available only after the Secretary renders a 'final decision' on the claim, in the same manner as provided in 42 U.S.C. § 405(g) for old age and disability claims arising under Title II of the Social Security Act."  Heckler v. Ringer, 466 U.S. 602, 605 (1984) (footnote omitted) (quoting 42 U.S.C. § 1395ff(b)(1)(c)); see also Affinity Healthcare Servs., Inc. v. Sebelius, 746 F. Supp. 2d 106, 107 (D.D.C. 2010) ("A decision of the [Board] constitutes a final agency ruling, unless reviewed by the CMS Administrator, to whom the HHS Secretary has delegated the authority to review [Board] rulings.").

The Medicare Act provides for expedited judicial review in federal district court when the contested issue "involves a question of law or regulations relevant to the matters in controversy [and] the Board determines (on its own motion or at the request of a provider of services . . . ) that it is without authority to decide the question."  42 U.S.C. § 1395oo(f)(1); see also Allina Health Servs. v. Price, 863 F.3d 937, 938 (D.C. Cir. 2017) (noting that "the Board does not have the authority to declare statutes or regulations invalid"), petition for cert. filed, No. 17-1484 (U.S. Apr. 27, 2018).  As this Circuit has explained, "Congress has allowed providers to

seek immediate judicial review when the Board concludes that an extensive and time-consuming administrative process before the Board would likely be pointless" due to the Board's lack of authority to decide the legal question. Allina Health Servs., 863 F.3d at 942. The Board's determination regarding its legal authority "shall be considered a final decision and not subject to review by the Secretary." 42 U.S.C. § 1395oo(f)(1). And, "a district court may not review the Board's no-authority determination" because the Medicare "statute conditions expedited judicial review in the district court on the existence of that no-authority determination, not on whether that determination is correct." Allina Health Servs., 863 F.3d at 941; see also Clarian Health W., LLC v. Hargan, 878 F.3d 346, 354 (D.C. Cir. 2017) ("[T]he Medicare Act does not permit courts to revisit the Board's decision to grant expedited judicial review, or to question the Board's determination that it lacked authority over a question or claim.").

**B.      Factual Background**

East Texas is "a 127-bed acute care hospital located in Athens, Texas, which is located in Henderson County, Texas." JA 7. "There is no dispute that [East Texas] me[e]t[s] the conditions set forth in the Lugar Statute to be designated as an urban hospital" under the Lugar Statute for the purpose of calculating its wage index. JA 8. And, according to East Texas, "[s]ince at least 1993, CMS has assigned Henderson County to the Dallas-Plano-Irving urban area" ("the Dallas CBSA") pursuant to the Lugar Statute. Pl.'s Mem. at 8; see also JA 287 (same).

**1.      The Fiscal Year 2015 Wage Index**

On May 15, 2014, CMS published a proposed rule in the Federal Register in which it, among other things, "propos[ed] revisions to the wage index for acute care hospitals and the annual update of the wage data[,] . . . includ[ing] . . . [p]roposed changes in CBSAs as a result of

new OMB labor market area delineations and proposed policies related to the proposed changes in CBSAs." Proposed Rule Regarding Hospital Inpatient Prospective Payment Systems and Fiscal Year 2015 Rates ("2014 Proposed Rule"), 79 Fed. Reg. 27,978, 27,993 (proposed May 15, 2014).[4] CMS explained that it "currently define[s] hospital labor market areas based on the delineations of statistical areas established by the [OMB]," and that the Medicare Act "requires the Secretary to update the wage index annually . . . tak[ing] into account the geographic reclassification of hospitals in accordance with [the Lugar Statute] . . . when calculating [prospective payment rate] amounts." Id. at 28,054. CMS noted that on February 28, 2013, the OMB had issued its revised delineations of MSAs based on the OMB's new standards and the 2010 Census, id., and, "[i]n order to implement these changes for the [prospective payment rates], it is necessary to identify the new labor market area delineation for each county and hospital in the country," id. at 28,055. Additionally, CMS noted that "the effect of the new OMB delineations on," among other things, the "treatment of hospitals located in certain rural counties (that is, 'Lugar' hospitals)[,] . . . needed to be extensively reviewed and verified, [and thus CMS] w[as] unable to undertake such a lengthy process before publication of the [ ] 2014 [ ] [P]roposed [R]ule." Id. As a result, CMS proposed implementing the new OMB delineations for purposes of revising the annual wage index the first time for fiscal year 2015. See id.

> CMS noted that the Lugar Statute
>
> requires the Secretary to "treat a hospital located in a rural county adjacent to one or more urban areas as being located in the urban [MSA] to which the greatest number of workers in the county commute" if certain adjacency and commuting criteria are met. The criteria utilize standards for designating [MSAs] published in the Federal Register by the Director of the [OMB] based on the most recently available decennial population data. Effective beginning [fiscal year] 2005, [CMS] used OMB's CBSA standards based on the 2000 Census and the 2000 Census data to identify counties in which hospitals qualify under [the Lugar Statute] to receive

[4] The Court cites to the Federal Register for CMS's 2014 Proposed and Final Rules and not the Joint Appendix because the parties included only excerpts of these rules in their Joint Appendix.

the wage index of the urban area. Hospitals located in these counties have been known as "Lugar" hospitals and the counties themselves are often referred to as "Lugar" counties.

Id. at 28,075. Going forward, CMS stated that it was

> proposing to implement OMB's revised labor market area delineations based on the Census 2010 data for purposes of determining applicable wage ind[ic]es for acute care hospitals beginning in [fiscal year] 2015. As [it] ha[d] done in the past, [it] also [ ] propos[ed] to use the new OMB delineations to identify rural counties that would qualify as "Lugar" under [the Lugar Statute] and therefore would be redesignated to urban areas for [fiscal year] 2015. [CMS] [ ] propos[ed] to revise the regulations at [42 C.F.R.] § 412.64(b)(3)(i) to reflect the most recent OMB standards for delineating statistical areas adopted by CMS.

Id. As a result of these proposed revisions, CMS proposed designating Henderson County, Texas as part of the Tyler, Texas CBSA (the "Tyler CBSA") for fiscal year 2015, id. at 28,077, "based on the criteria discussed above," id. at 28,075. However, CMS did not provide the specific "adjacency and commuting" data upon which it relied in the 2014 Proposed Rule. See id. at 28,075–77.

On August 22, 2014, CMS published its final rule regarding the fiscal year 2015 wage index. See Final Rule Regarding Hospital Inpatient Prospective Payment Systems and Fiscal Year 2015 Rates ("2014 Final Rule"), 79 Fed. Reg. 49,853, 49,854 (Aug. 22, 2014) (codified at 42 C.F.R. pts. 405, 412–13, 415, 422, 424, 485, 488).[5] CMS noted that it "did not receive any public comments with regard to [its] proposal to use the new OMB delineations to identify rural

---

[5] On October 3, 2014, CMS published a correction to the 2014 Final Rule in which it "correct[ed] technical and typographical errors in the final rule that appeared in the August 22, 2014 Federal Register." Correction to Final Rule Regarding Hospital Inpatient Prospective Payment Systems and Fiscal Year 2015 Rates, 79 Fed. Reg. 59,675, 59,675 (Oct. 3, 2014) (codified at 42 C.F.R. pts. 405, 412–13, 415, 422, 424, 485, 488). Those corrections are not at issue in this appeal, see id. at 59,675–76 (summarizing the errors as related to (1) the payment adjustment of the Hospital Acquired Condition Reduction Program; (2) new technology add-on payments; (3) voluntary electronic clinical quality measures; (4) the web site link for the Cancer Hospital Quality Reporting Program; (5) the Long-Term Care Hospital Quality Reporting Program; and (5) organ transplant centers), and therefore, the Court will refer to the August 22, 2014 publication as the 2014 Final Rule, see id. at 59,675 (noting that "[t]he provisions in this correction document are effective as if they had been included in the [Final Rule] that appeared in the August 22, 2014 Federal Register.").

counties that would qualify as 'Lugar' under [the Lugar Statute]," and therefore it "finaliz[ed] the policy as proposed." Id. at 49,980.

## 2. Proceedings Before the Board

East Texas "timely appealed" to the Board "from the . . . [2014] Final Rule to dispute its redesignation to the Tyler [ ] CBSA" on the grounds "that CMS should have redesignated it to the Dallas CBSA[,] which would increase both [its] wage index and its Medicare reimbursement." JA 7. As stated earlier, the parties did not dispute that East Texas "qualifie[d] as a 'Lugar' hospital." JA 23; see also JA 289 (in East Texas's Final Position Paper before the Board, it stated that "CMS has correctly . . . determined that Henderson County continues to qualify as a Lugar [c]ounty"). But, East Texas argued that it should have been assigned to the Dallas CBSA because that CBSA "is the urban area 'to which the greatest number of workers in [Henderson County] commute.'" JA 290 (alteration in original).

Novitas Solutions, Inc., the MAC assigned to East Texas, disagreed. It argued that East Texas was correctly assigned to the Tyler CBSA because "more commuters from Henderson [County] commute to the central county of the Tyler CBSA[] than to the central counties of the Dallas CBSA." JA 23–24. The Board held a telephonic hearing on East Texas's appeal July 23, 2015. JA 7.[6]

---

[6] On July 31, 2015, the Board sent a letter to the parties requesting briefing on "whether the Board has the authority to grant the relief sought in this case." Compl., Exhibit ("Ex.") C (Letter from the Board to counsel (July 31, 2015)) at 3. Following the submission of that briefing, on March 16, 2016, the Board sent another letter to counsel, stating that it had "conclude[d] that it ha[d] jurisdiction over East Texas'[s] appeal and ha[d] the authority to decide the specific legal question challenged," and therefore, it "denie[d] expedited judicial review [ ] on its own motion." Id., Ex. D (Letter from the Board to East Texas's counsel (Mar. 16, 2016) ("2016 Board Letter")) at 1. In the 2016 Board Letter, the Board noted that, by regulation, it must grant expedited judicial review of a legal question if it finds that it has jurisdiction, but "lacks the authority to decide a specific legal question relevant to the specific matter at issue because the legal question is a challenge either to the constitutionality of a provision of a statute, or to the substantive or procedural validity of a regulation or CMS Ruling." Compl., Ex. D (2016 Board Letter) at 5 (quoting 42 C.F.R. § 405.1842(f)). The Board stated that in this case, "East Texas does not challenge the constitutionality of the Lugar Statute, nor does East Texas challenge the validity of the regulation. Instead, East Texas challenges the application of the Lugar Statute. Therefore, the Board f[ound] that this case d[id] not meet the prerequisite for granting [expedited judicial review]." Id., Ex. D (2016 Board Letter) at 6.

On January 27, 2017, the Board issued its decision, in which a majority of its members concluded that the Board "d[id] not have the authority to grant the relief sought in th[e] appeal, that is, the redesignation of Henderson County from the Tyler CBSA to the Dallas[] CBSA." JA 7. The majority stated:

> In considering whether the Board has the authority to grant the relief requested in this case, the Board majority note[s] that the Board must comply with all of the provisions of [the Medicare] Act and regulations and must afford "great weight to interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS." With regards to regulations, the D.C. Circuit has confirmed that the language of a preamble to a final rule may be binding regulatory language if that language "has independent legal effect, which . . . is a function of [ ] the agency's intention to bind either itself or regulated parties." Accordingly, the Board may be bound by CMS policies or determinations stated in the preamble to a final rule if that language has "independent legal effect" as evidenced by an intent to either bind the agency and/or the regulated parties.

> Specific to this case, in the preamble to the [2014] Proposed Rule, CMS published a table describing the counties that would be designated as part of an urban area to which each of these counties were being redesignated[.]

> * * *

> In this table, CMS proposed to redesignate Henderson County, Texas to the CBSA for Tyler, Texas. . . .

JA 11 (footnotes omitted) (first quoting 42 C.F.R. § 405.1867; then quoting Kennecott Utah Copper Corp. v. U.S. Dep't of Interior, 88 F.3d 1191, 1223 (D.C. Cir. 1996)). After examining the Proposed and Final Rules at issue, "the Board majority f[ound] that it d[id] not have the authority to grant the relief sought" because "CMS intended the Lugar redesignations to be binding . . . and not subject to Board review." JA 12.[7]

One member of the Board dissented in part and concurred in part, stating that he "d[id] not agree with the majority's . . . conclusion that the Board has no authority to provide a remedy

---

[7] The majority did not acknowledge that it was reversing the position that it took in the 2016 Board Letter, i.e., that it did have the authority to decide the question presented because East Texas was challenging the application of the Lugar Statute, not the statute's constitutionality or a CMS regulation's or ruling's validity. See JA 6–13.

because it is bound by the redesignation to the [CBSA] published in the preamble to the applicable final rule." JA 14. That member noted that East Texas was "not challenging the Lugar [S]tatute, nor [wa]s it challenging the associated regulations, but only the application thereof as manifest in a table presented in the Federal Register preambles." Id. On March 27, 2017, CMS "declined to review" the Board's decision. JA 1 (advising East Texas that it had sixty days from the date it received the Board's decision to seek judicial review).

East Texas timely filed this action for judicial review, see Compl. ¶ 1, asserting two claims under the Medicare Act and the APA, id. ¶¶ 27–28, 68–79.[8] In Count I, East Texas alleges that the Secretary's assignment of East Texas to the Tyler CBSA violates the APA in three respects: the assignment (1) "is contrary to the [Lugar S]tatute's plain language and implementing regulations because the Secretary failed to assign [it] to the CBSA to which the greatest number of workers in [its] county commute," id. ¶ 71; (2) "is not supported by substantial evidence" as required by the APA because "more Henderson County workers commute to the Dallas[] CBSA than to the Tyler CBSA," id. ¶ 73, and (3) "violates the notice and comment rulemaking" requirements of the APA "[b]ecause no methodology implementing the Lugar Statute has been promulgated in the Federal Register or otherwise that supports the Secretary's calculation leading to his decision to assign [East Texas] to the Tyler CBSA," id. ¶ 74. In Count II, East Texas alleges that the Board's decision that it lacked authority to grant the relief requested violates the APA because the Board "possessed authority to entertain and grant [East Texas's] Petition as a matter of law." Id. ¶ 79. The parties then filed their cross-motions for summary judgment, see generally Pl.'s Mot.; Def.'s Mot., as well as supplemental briefing

---

[8] As East Texas notes in its Complaint, "42 U.S.C. § 1395oo(f) provides for review of PRRB's decisions below and the Secretary's determination of the correct Lugar wage area redesignation at issue pursuant to the applicable provisions of the [APA]." Compl. ¶ 68; see 42 U.S.C. § 1395oo(f)(1) (providing for judicial review of Board decisions "pursuant to the applicable provisions under [the APA]").

ordered by the Court, <u>see generally</u> Pl.'s Resp.; Def.'s Resp.; <u>see also</u> Order at 2 (Aug. 1, 2018),

ECF No. 21 ("[T]he Court has determined that it would benefit from additional briefing

regarding whether the Secretary has previously explained his application and interpretation of the

Lugar Statute . . . .").

## II.    STANDARD OF REVIEW

A party is entitled to summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "Pursuant to the Medicare statute, the court reviews [Board] decisions in

accordance with the standard of review set forth in the APA," <u>Swedish Am. Hosp. v. Sebelius</u>,

773 F. Supp. 2d 1, 6 (D.D.C. 2011); <u>see also</u> 42 U.S.C. § 1395oo(f)(1), and in the APA context,

summary judgment is the mechanism for deciding whether, as a matter of law, an agency action

is supported by the administrative record and is otherwise consistent with the APA standard of

review, <u>see, e.g.</u>, <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415–16 (1971),

<u>abrogated on other grounds by</u> <u>Califano v. Sanders</u>, 430 U.S. 99 (1977).  But, due to the limited

role a district court plays in reviewing the administrative record, the typical summary judgment

standards set forth in Federal Rule of Civil Procedure 56 are not applicable.  <u>Stuttering Found. of</u>

<u>Am. v. Springer</u>, 498 F. Supp. 2d 203, 207 (D.D.C. 2007), <u>aff'd</u>, 408 F. App'x 383 (D.C. Cir.

2010).  Rather, "[u]nder the APA, it is the role of the agency to resolve factual issues to arrive at

a decision that is supported by the administrative record, whereas 'the function of the district

court is to determine whether or not as a matter of law the evidence in the administrative record

permitted the agency to make the decision it did.'"  <u>Id.</u> (quoting <u>Occidental Eng'g Co. v. INS</u>,

753 F.2d 766, 769–70 (9th Cir. 1985)).  In other words, "when a party seeks review of agency

action under the APA, the district judge sits as an appellate tribunal," and "[t]he 'entire case' on

review is a question of law."  Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote and citations omitted).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness."  FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  However, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); see Citizens to Preserve Overton Park, 401 U.S. at 416 ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.").  Nonetheless, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).  A court must uphold an agency decision "so long as [it] 'engaged in reasoned decisionmaking and its decision is adequately explained and supported by the record.'"  Clark Cty., Nev. v. FAA, 522 F.3d 437, 441 (D.C. Cir. 2008) (quoting N.Y. Cross Harbor R.R. v. Surface Transp. Bd., 374 F.3d 1177, 1181 (D.C. Cir. 2004)).

With respect to the defendant's statutory interpretation of the Medicare Act, under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., the Court must first consider "whether Congress has directly spoken to the precise question at issue," and, if "the intent of Congress is clear" from the statute's language, "that is the end of the matter; for the [C]ourt, as well as the agency, must give effect to the unambiguously expressed intent of

Congress." 467 U.S. 837, 842–43 (1984). However, if the statute is ambiguous, the Court shall

defer to the Secretary's reasonable construction of the statute. See id. Deference is due "not

only because Congress has delegated law-making authority to the [Secretary], but also because

[his] agency has the expertise to produce a reasoned decision." Vill. of Barrington, Ill. v.

Surface Transp. Bd., 636 F.3d 650, 660 (D.C. Cir. 2011). With respect to the agency's

interpretation of its own regulations, the Court must accept the agency's interpretation unless

plainly erroneous or inconsistent with the regulations themselves. See Auer v. Robbins, 519

U.S. 452, 461 (1997). "Where the regulations involve a complex, highly technical regulatory

program such as Medicare, broad deference is 'all the more warranted.'" Swedish Am. Hosp.,

773 F. Supp. 2d at 7 (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)).

### III.     ANALYSIS

#### A.     Whether East Texas's Challenge to the CBSA Assignment Is Waived

The Secretary raises a threshold issue, arguing that East Texas "has waived the

opportunity to challenge [his] assignment of Henderson County to the Tyler [ ] CBSA" because

it "did not submit any comment raising any question as to whether the proposed assignment was

correct or indicating that it had any concerns regarding the proposed assignment," even though it

"had the opportunity to raise [its concerns] during the notice-and-comment period following

publication of the . . . [2014] [P]roposed [R]ule." Def.'s Mem. at 12. Therefore, according to

the Secretary, "[b]ecause [East Texas] failed to present its challenge to the agency for its initial

consideration during the rulemaking process, [it] has forfeited its 'opportunity to challenge' the

agency's rulemaking on the basis that the designation of Henderson County to the Tyler [ ]

CBSA is incorrect." Id. at 13. The Court disagrees.

Two members of this Court have rejected identical waiver arguments made by the Secretary, holding that where plaintiffs timely challenge the application of a regulation through the Board's review process, their failure to raise their challenges through comments to the proposed regulation during the rulemaking process does not constitute a waiver. In Banner Health v. Burwell, Judge Kollar-Kotelly explained:

> The Medicare Act allows judicial review of legal issues pertaining to regulations pursuant to the scheme described above: by filing timely appeals of payment determinations with the PRRB and seeking judicial review on legal issues outside the scope of the PRRB's authority. See 42 U.S.C. § 1395oo(a)(3); id. § 1395oo(f)(1). [The p]laintiffs have done so here. Indeed, [the Secretary] does not contest the timeliness of [the p]laintiffs' challenges to the payment determinations from the relevant fiscal years. Nor does [the Secretary] contend that a challenge to those payment determination[s] cannot be the appropriate vehicle for challenging the regulations on which those payment determinations depend. However, [the Secretary] argues, nonetheless, that various arguments by [the p]laintiffs are barred because they were never placed before the agency during the various rulemaking proceedings subject to challenge in this action. In support of this proposition, [the Secretary] cite[s] to various cases that stand for the proposition that arguments must be raised before an agency before they can be raised in court. See, e.g., Nuclear Energy Inst., Inc., v. EPA, 373 F.3d 1251, 1298 (D.C. Cir. 2004). But those cases do not tell the whole story. Even where a party has waived its opportunity to pursue facial review of a regulation by failing to comment during a rulemaking proceeding, such a party can raise its arguments when the agency applies the rule. See Koretoff v. Vilsack, 707 F.3d 394, 399 (D.C. Cir. 2013) (citing Murphy Exploration & Production Co. v. U.S. Department of Interior, 270 F.3d 957, 958 (D.C. Cir. 2001)).

Banner Health, 126 F. Supp. 3d 28, 68 (D.D.C. 2015) (footnote omitted), aff'd in part, rev'd in part sub nom. Banner Health v. Price, 867 F.3d 1323 (D.C. Cir. 2017). Similarly, in Lee Memorial Health System v. Burwell, Judge Collyer determined that the plaintiffs' challenges to certain Medicare regulations for various fiscal years were not waived, even though the plaintiffs had not raised their claims during the rulemaking process, because they "properly challenged each rulemaking through challenges to the application of the [ ] rules," 206 F. Supp. 3d 307, 327

(D.D.C. 2016), when they appealed to the Board, see id. at 320 (noting that the Board granted the plaintiffs expedited judicial review).

In this case, East Texas properly challenged the assignment of Henderson County to the Tyler CBSA under the Lugar Statute in the 2014 Final Rule when it timely filed a request for a hearing before the Board on October 17, 2014. See JA 308; see also JA 7 (the Board noting in its final decision that East Texas "timely appealed from the [2014] Final Rule to dispute its redesignation to the Tyler [ ] CBSA"). The Court agrees with its colleagues that because East Texas timely challenged its Lugar county assignment adopted in the 2014 Final Rule through the Board's administrative process, it did not waive its opportunity to judicially challenge the assignment. See Lee Mem'l Health Sys., 206 F. Supp. 3d at 327; Banner Health, 126 F. Supp. 3d at 68.[9]

## B. Whether the Secretary Adequately Explained His Interpretation and Application of the Lugar Statute and Implementing Regulation

The Secretary contends that the commuting patterns of Henderson County are relevant not only in determining whether the county qualifies as a Lugar county, but also in determining to which CBSA it should be assigned pursuant to the Lugar Statute. See Def.'s Mem. at 13–17. The Secretary explains his Lugar county qualification and assignment methodology as follows:

> [I]n determining whether a rural county qualifies as a Lugar county, HHS examines commuting data to central counties of CBSAs; if a rural county qualifies as a Lugar county, then HHS compares commuting data to central counties of adjacent urban areas in determining the urban area to which a rural county should be assigned.

---

[9] East Texas argues that its failure to comment on the 2014 Proposed Rule does not constitute a waiver because the Secretary failed to adequately explain its methodology and rationale for assigning rural counties under the Lugar Statute in the Proposed Rule, and therefore, "[t]here can be no waiver where there has been no proper notice" on the part of the agency. See Pl.'s Reply at 11. Having concluded that East Texas did not waive its opportunity to challenge the assignment because it timely filed a notice for a hearing before the Board, the Court need not resolve East Texas's argument that it did not waive its challenge because it was not given adequate notice. However, for reasons explained below, see infra Part III.B, the Court agrees with East Texas that the Secretary's explanation regarding the CBSA assignments pursuant to the Lugar Statute in the 2014 Final Rule was inadequate.

Id. at 16.

East Texas argues that this interpretation and application of the Lugar Statute and implementing regulation is unlawful both for procedural reasons and on the merits.[10] Regarding the alleged procedural deficiencies, East Texas contends that "[b]efore [it] filed this action, the agency had never explained or announced its decision to consider only the number of central-county bound commuters" when making Lugar Statute assignments, Pl.'s Mem. at 20, and therefore, CMS's action is arbitrary and capricious given its "fail[ure] to offer any explanation at all," id. at 21; see also Compl. ¶ 74 ("Because no methodology implementing the Lugar Statute has been promulgated in the Federal Register or otherwise supports the Secretary's calculation leading to his decision to assign [East Texas] to the Tyler CBSA, the decision . . . is arbitrary and capricious and otherwise contrary to [ ] law."). The Court agrees.

As stated above, under the APA, the Secretary is required to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines, 371 U.S. at 168). Agency action cannot be upheld "if it fails to consider 'significant and viable and obvious alternatives," Dist. Hosp. Partners, L.P. v. Burwell, 786 F.3d 46, 59 (D.C. Cir. 2015) (quoting Nat'l Shooting Sports Found., Inc. v. Jones, 716 F.3d 200, 215 (D.C. Cir. 2013)), nor can a court "affirm agency decisions on a legal analysis other than that expressed by the agency," Catholic Healthcare W. v. Sebelius, 748 F.3d 351, 354 (D.C. Cir. 2014); see also

---

[10] As to the merits, East Texas argues that the Secretary's assignment of Henderson County to the Tyler CBSA contravenes both the Lugar Statute itself, 42 U.S.C. § 1395ww(d)(8)(B)(i), as well as HHS's regulation implementing the Lugar Statute, 42 C.F.R. § 412.64(b)(3)(i), because the Secretary, "[i]nstead of counting the number of [Henderson County] workers traveling to each urban area, . . . counted only those Henderson County workers travelling to the central counties of the adjacent urban areas." Pl.'s Mem. at 15. Because the Court concludes that the Secretary never explained his interpretation and application of the Lugar Statute and implementing regulation, this case must be remanded to the Secretary to afford him the opportunity to provide his explanation in the first instance. Therefore, the Court need not reach East Texas's argument on the merits.

Summer Hill Nursing Home LLC v. Johnson, 603 F. Supp. 2d 35, 39 (D.D.C. 2009) (rejecting the Secretary's litigation position because "[n]owhere in the Secretary's decision is that rationale articulated, and the Court cannot accept the lawyers' post hoc rationalization").

In the context of rulemaking, "[t]he agency must [ ] provide the public with a meaningful opportunity to comment on a proposed rule and must offer reasoned responses to significant comments." Shands Jacksonville Med. Ctr. v. Burwell, 139 F. Supp. 3d 240, 261 (D.D.C. 2015) (citing Dist. Hosp. Partners, 786 F.3d at 56–57). "If the notice of proposed rule-making fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals." Id. (quoting Conn. Light & Power Co. v. Nuclear Regulatory Comm'n, 673 F.2d 525, 530 (D.C. Cir. 1982)). And if an agency's proposed action relies on a methodology, it must also disclose that methodology because it is "unquestionably among 'the most critical factual material . . . used to support the agency's position.'" Owner–Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin., 494 F.3d 188, 201 (D.C. Cir. 2007) (quoting Air Transp. Ass'n of Am. v. FAA, 169 F.3d 1, 7 (D.C. Cir. 1999)). In short, "the APA [ ] require[s] the disclosure of assumptions critical to the agency's decision, in order to facilitate meaningful comment and allow a 'genuine interchange' of views." Shands Jacksonville Med. Ctr., 139 F. Supp. 3d at 265 (citing Conn. Light & Power, 673 F.2d at 530).

In response to East Texas's argument that the Secretary never explained his interpretation and application of the Lugar Statute and its implementing regulation requiring the consideration of the commuting data to central counties when assigning qualified Lugar counties to CBSAs, the Secretary argues that his assignment of Henderson County to the Tyler CBSA in the 2014 Final Rule "reflected application of longstanding policies based on updated census information

and data and OMB delineations." Def.'s Mem. at 18. According to the Secretary, he "has

consistently explained [his] approach and interpretation of the Lugar Statute" outlined above,

and cites three final rules published in the Federal Register in 1988, 2001, and 2004, in support

of this assertion. Def.'s Reply at 13 (first citing Medicare Program; Changes to the Inpatient

Hospital Prospective Payment System and Fiscal Year 1989 Rates ("1988 Final Rule"), 53 Fed.

Reg. 38,476, 38,499 (Sept. 30, 1988); then citing Medicare Program; Changes to the Hospital

Inpatient Prospective Payment Systems and Rates and Costs of Graduate Medical Education:

Fiscal Year 2002 Rates; Provisions of the Balanced Budget Refinement Act of 1999; and

Provisions of the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of

2000 ("2001 Final Rule"), 66 Fed. Reg. 39,828, 39,869 (Aug. 1, 2001); and then citing Medicare

Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005

Rates ("2004 Final Rule"), 69 Fed. Reg. 48,916, 49,056 (Aug. 11, 2004). The Court will

consider each of these final rules in turn.

### 1.     The 1988 Final Rule

The 1988 Final Rule appears to be CMS's[11] first interpretation of the Lugar Statute, see

1988 Final Rule, 53 Fed. Reg. at 38,499, which, as noted above, was enacted as part of the

Omnibus Budget Reconciliation Act of 1987, see Pub. L. No. 100-203, § 4005, 101 Stat. at

1330–47 to –48. In that rule, CMS summarized the Lugar Statute as "provid[ing] that, if certain

conditions are met, the Secretary would treat a hospital located in a rural county adjacent to one

or more urban areas as being located in the urban area to which the greatest number of workers

in the county commute." 1988 Final Rule, 53 Fed. Reg. at 38,499; see also 42 U.S.C.

---

[11] At that time, CMS was known as the Health Care Financing Administration. See 1988 Final Rule, 53 Fed. Reg. at
38,476; see also Ark. Dep't of Health & Human Servs. v. Ahlborn, 547 U.S. 268, 275 n.3 (2006) ("Until
2001, CMS was known as the Health Care Financing Administration or HCFA.").

§ 1395ww(d)(8)(B)[12] (instructing the Secretary to employ "the standards for designating [MSAs]" that were "published in the Federal Register on January 3, 1980").  CMS then summarized those standards, which concerned (1) workers' commuting rates "between the county and the central county or counties of any adjacent MSA," and (2) the rural county's "metropolitan character."  1988 Final Rule, 53 Fed. Reg. at 38,499.  Further, CMS noted that "[t]he determination as to whether a county qualifies for inclusion in an MSA is made based on data from the Bureau of the Census."  Id.  Finally, CMS stated:

> For purposes of payment under the prospective payment system, as required by [the Lugar Statute], we proposed that a hospital located in a rural county that qualifies under this provision would be deemed to be located in the MSA to which the greatest number of workers in the rural county commute.

Id.  The rest of the section concerning the Lugar Statute consists of examples of how OMB determines a county's commuting rate for purposes of determining whether it "meets the criteria for being designated an outlying county of an MSA."  Id.

In the Court's view, nothing in the 1988 Final Rule explains CMS's interpretation of the Lugar Statute and corresponding regulation advanced in this litigation.  The Court finds that it is unclear from CMS's summary of the OMB standards whether CMS believed the central county commuting data was relevant to determining whether a rural county qualified as a Lugar county, determining to which CBSA a Lugar county should be assigned, or both.  This lack of clarity does not support the Secretary's position in this case that he "consistently explained [his] approach and interpretation of the Lugar Statute," Def.'s Reply at 13, as requiring that central county data be considered for both qualification and assignment purposes.  In other words, CMS stated in the 1988 Final Rule that "a hospital located in a rural county that qualifies under this

---

[12] As the Secretary correctly notes, "[t]he polices and regulations [cited in the 1988 Final Rule] have remained largely unchanged, but have been updated and applied in keeping with the evolving OMB geographic classification standards and delineations and updated census data."  Def.'s Mem. at 8.

provision would be deemed to be located <u>in the MSA</u> to which the greatest number of workers in the rural county commute," <u>id.</u> (emphasis added), but did not state that central counties are relevant to the <u>assignment</u> of Lugar counties to their corresponding urban areas. Accordingly, the Court concludes that the 1988 Final Rule is silent regarding how CMS assigns qualifying Lugar counties to CBSAs, and therefore does not explain the Secretary's interpretation and application of the Lugar Statute and its implementing regulation as advanced in this litigation.

## 2.  The 2001 Final Rule

In the 2001 Final Rule, CMS described statutory and regulatory changes that impacted the calculation of Lugar counties. <u>See</u> 2001 Final Rule, 66 Fed. Reg. at 39,868. Specifically, it explained:

> On March 30, 1990, OMB issued revised 1990 standards [for designated MSAs]. There has been an increasing amount of interest by the hospital industry in using the 1990 standards as opposed to the 1980 standards to determine which hospitals qualify under the provisions set forth in [the Lugar Statute]. Section 402 of Public Law 106–113 provides that, with respect to [fiscal years] 2001 and 2002, a hospital may elect to have the 1990 standards applied to it for purposes of [the Lugar Statute] and that, beginning with [fiscal year] 2003, hospitals will be required to use the standards published in the Federal Register by the Director of OMB based on the most recent decennial census.

> We worked with staff of the Population Distribution Branch within the Population Division of the Census Bureau to compile a list of hospitals that meet the March 30, 1990 standards using 1990 census population data and information prepared for the Metropolitan Area Standards Review Project.

<u>Id.</u> (internal citation omitted). Then, CMS outlined "[t]he conditions that must be met for a hospital located in a rural county adjacent to one or more urban areas to be treated as being located in the urban area to which the greatest number of workers in the rural county commute," <u>id.</u>, which included (1) workers' commuting rates "between the county and the central county or counties of any adjacent MSA," and (2) the rural county's "metropolitan character," <u>id.</u> and are, as the Secretary notes, <u>see</u> Def.'s Resp. at 5, largely the same in scope as the conditions set forth

in the 1988 Final Rule, but contain different numerical thresholds, <u>compare</u> 1988 Final Rule, 53

Fed. Reg. at 38,499, <u>with</u> 2001 Final Rule, 66 Fed. Reg. at 39,868.  CMS noted that, in

"apply[ing] the 1990 standards[,] as opposed to 1980 standards, the number of qualifying

[Lugar] counties increase[d] from 22 to 31," and that "for three of the [Lugar C]ounties, the

MSA assigned is different from the MSA that would be assigned using the 1990 standards."

2001 Final Rule, 66 Fed. Reg. at 39,869.  Upon review of the 2001 Final Rule, the Court

concludes that this rule, like the 1988 Final Rule, does not explain the Secretary's position

advanced in this litigation because the 2001 Final Rule is silent as to how CMS makes CBSA

assignments of Lugar counties after determining that they qualify as Lugar counties.[13]

### 3.      The 2004 Final Rule

Finally, in the 2004 Final Rule, CMS published the wage index for fiscal year 2005.  <u>See</u>

2004 Final Rule, 69 Fed. Reg. at 48,916 (titling the 2004 Final Rule "Medicare Program;

Changes to the Hospital Inpatient Prospective Payment Systems and <u>Fiscal Year 2005 Rates</u>"

(emphasis added)).  CMS noted that at the time it adopted the 2001 Final Rule discussed above,

"updated standards based on the Census 2000 data were not available." <u>Id.</u> at 49,056.  Therefore,

for fiscal year 2005, for the first time, CMS "us[ed] OMB's 2000 CBSA standards and the

Census 2000 data to identify counties qualifying under [the Lugar Statute]." <u>Id.</u>  And CMS

noted that, in applying this new census data, the number of qualifying Lugar counties

"increase[d] from 28 to 98." <u>Id.</u>  After identifying the Lugar counties and their assigned CBSAs,

<u>see id.</u> at 49,057–59, CMS responded to the four categories of comments it had received on

Lugar counties in response to its 2004 proposed rule, none of which concerned the Secretary's

---

[13] CMS's statement that the application of the 1990 standards changed the assignment of three Lugar counties, <u>see</u> 2001 Final Rule, 66 Fed. Reg. at 39,869, does not explain how CMS makes CBSA assignments because CMS did not explain how it made these assignment changes, and they could have been the result of the updated census data CMS used.

interpretation and application of the Lugar Statute at issue here, see id. at 49,059–60 (responding to comments concerning: (1) counties that no longer qualified as Lugar counties under the 2000 census data; (2) the utilization of 2003 census data; (3) two improper classifications of counties in New Hampshire and Connecticut; and (4) CMS's decision not to adopt micropolitan statistical areas). Upon review of the 2004 Final Rule, the Court concludes that it, like the 2001 and 1988 Final Rules, does not explain the Secretary's interpretation and application of the Lugar Statute and its implementing regulation advanced in this litigation because the 2004 Final Rule is also silent as to how CMS makes CBSA assignments once it determines which counties qualify as Lugar counties under the statute.

The Secretary argues that in the 1988, 2001, and 2004 Final Rules, CMS "made clear that the analysis for Lugar determinations and designations is based directly on OMB standards for determining whether an outlying county should be included in a CBSA[, and a]ccordingly, [its] methodology mirrors OMB's methodology." Def.'s Resp. at 4. The Court agrees with this statement in regards to Lugar county qualification determinations, but not as to how those qualifying Lugar counties are assigned. Rather, the Court agrees with East Texas that the Final Rules contain "no explanation of how [a] Lugar [c]ounty assignment determination is made" after a county qualifies as a Lugar county. Pl.'s Resp. at 5. Because the Court concludes that the Secretary did not explain in the 1988, 2001, or 2004 Final Rules how he makes Lugar county assignments under the Lugar Statute, and he failed to provide any explanation of the methodology he used to assign Henderson County to the Tyler CBSA in the 2014 Final Rule, the Secretary has failed to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" See State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines, 371 U.S. at 168).

"To be clear, this is not to say that the Court has concluded that the Secretary's assumptions and methodology [a]re unreasonable." Shands Jacksonville Med. Ctr., 139 F. Supp. 3d at 266. Rather, the Court has simply concluded that the Secretary has failed to adequately explain his interpretation and application of the Lugar Statute and implementing regulation in the 2014 Final Rule or the final rules predating it, and because the Court cannot "affirm agency decisions on a legal analysis other than that expressed by the agency," see Catholic Healthcare W., 748 F.3d at 354, it simply cannot consider the Secretary's interpretation and application advanced for the first time in this litigation, cf. Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell, 142 F. Supp. 3d 119, 132 (D.D.C. 2015) ("Because HHS did not explain in its proposal or issuance of the final rule that it was relying on the Secretary's authority [as outlined in certain statutory provisions], it cannot rely on those provisions now to justify the regulation."). Accordingly, the Court will grant the plaintiff's motion for summary judgment regarding its allegation in Count I that the Secretary's failure to explain his methodology for assigning qualified Lugar counties to CBSAs is unlawful under the standards set forth in the APA. See Compl. ¶ 74.

"The Supreme Court has explained that '[i]f the record before the agency does not support the agency action, . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" Banner Health v. Price, 867 F.3d at 1356 (alterations in original) (quoting Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985)). "In such circumstances, the agency must first be 'afford[ed] . . . an opportunity to articulate, if possible, a better explanation.'" Id. (alterations in original) (quoting Dist. Hosp. Partners, 786 F.3d at 60); see also Am. Coll. of Emergency Physicians v. Price, 264 F. Supp. 3d 89, 96 (D.D.C. 2017) ("Because the Court remands for further explanation of the rule, it does not yet

reach [the p]laintiff's separate arguments regarding the rule's perceived substantive shortcomings . . . ."). Accordingly, the Court denies without prejudice the remainder of East Texas's motion for summary judgment and the entirety of the Secretary's cross-motion for summary judgment and declines to reach at this time the merits of the Secretary's interpretation and application of the Lugar Statute and implementing regulation.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that East Texas did not waive its challenge to the CBSA assignment under the Lugar Statute for fiscal year 2015 by failing to submit a comment to the Secretary's 2014 Proposed Rule. The Court also concludes that the Secretary did not adequately explain his assignment of Henderson County to the Tyler CBSA or his interpretation and application of the Lugar Statute and implementing regulation requiring an examination of the commuting data to central counties when assigning qualified Lugar counties to CBSAs, and thus, he violated the standards set forth in the APA. Finally, the Court concludes that the proper remedy for this violation is to remand this case to the Secretary so that he may provide a meaningful explanation and an opportunity for the public to comment on how qualified Lugar counties are assigned to CBSAs under the Lugar Statute and implementing regulation. Accordingly, the Court will grant in part and deny in part without prejudice East Texas's motion for summary judgment, deny without prejudice the Secretary's cross-motion for summary judgment, and remand this case to the Secretary for further action consistent with this opinion.

**SO ORDERED** this 18th day of October, 2018.[14]

REGGIE B. WALTON
United States District Judge

---

[14] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.